Andrew DEVERS, Plaintiff,

v.

QUIVIRA, INC., Defendant.

No. 97–2586–JWL.

United States District Court,
D. Kansas.

Dec. 2, 1998.

Joseph R. Colantuono, Christopher J. Reedy, Wehrman & Colantuono, LLC, Leawood, KS, for Andrew Devers, plaintiff.

Kristopher A. Kuehn, Brian F. Stayton, Blackwell Sanders Peper Martin LLP, Overland Park, KS, for Quivira, Inc., defendant.

### MEMORANDUM AND ORDER

LUNGSTRUM, District Judge.

Plaintiff Andrew Devers filed suit against defendant Quivira, Inc. alleging violations of the Age Discrimination in Employment Act, 29 U.S.C. § 621 et seq. Plaintiff also claims retirement and health care benefits from defendant under the Employee Retirement Income Security Act, 29 U.S.C. § 1001 et seq. This matter is presently before the court on defendant's motion for summary judgment

(doc. # 39) and plaintiff's motion for partial summary judgment (doc. # 41).

According to defendant, plaintiff was an independent contractor retained by Quivira and, thus, was not an "employee" for purposes of the ADEA. Defendant Quivira also maintains that plaintiff, as an independent contractor and pursuant to the terms of the applicable plan documents, was not entitled to coverage under the employee benefit plans of Quivira. As set forth in more detail below, defendant's motion for summary judgment is granted and plaintiff's motion for partial summary judgment is denied.

### I. Facts [1]

Defendant Quivira, Inc., is a corporation that owns and operates the Quivira Lake and Country Club in Lake Quivira, Kansas. Plaintiff Andrew Devers began his employment with Quivira as the head golf professional in September 1960. He remained an employee of Quivira until 1971. At that time, Quivira began treating plaintiff as an independent contractor. When presented with this change in his employment status, plaintiff understood that his agreement to become an independent contractor was a condition of his continued working relationship with Quivira. Thus, plaintiff agreed to do so. The last written contract between plaintiff and Quivira is dated January 11, 1991. Through the parties' course of conduct and by its terms, the contract was renewed and continued each year from 1992 through 1997. In April 1997, Quivira advised plaintiff that his annual contract would not be renewed beyond 1997.

*Plaintiff's Background*

Plaintiff is a Class A Golf Professional certified by the Professional Golfers Association (PGA).[2] To become a Class A PGA Professional, an individual has to acquire points from specialized educational courses, satisfactorily pass the Player's Ability Test (which measures a golfer's playing ability), and be approved by the local section of the

---

1. In accordance with the applicable summary judgment standard, the facts are uncontroverted or related in the light most favorable to plaintiff.

2. As of July 1998, there were 7679 Class A Golf Professionals of the PGA in the United States. Moreover, plaintiff's current handicap places him in the top 11 percent of all golfers in the United States.

PGA. Class A members of the PGA must be recertified every three years. Plaintiff paid all fees and expenses in connection with his recertification as a Class A Golf Professional. Quivira denied plaintiff's requests for reimbursement of these expenses.

## Plaintiff's Job Duties

The written contract and job description set forth the nature of plaintiff's duties as a golf professional for Quivira. The contract between the parties required plaintiff to "devote his full time, attention and energies to the performance of [his] duties" as a golf professional. Specifically, plaintiff was responsible for conducting all golf tournaments, supervising all golf activities for club members and their guests (*e.g.*, supervise proper charging for green fees and cart rentals; supervising tee times; providing golf instruction; operating a handicap system and maintaining a driving range), and maintaining and operating a golf pro shop. Plaintiff had the discretion to determine how these activities were performed. In fact, while plaintiff worked at Quivira, no employee or director of Quivira ever directed him how to spend his time on a particular day.

## The Pro Shop

Plaintiff had the exclusive right to sell golf-related merchandise, repair golf equipment, and rent golf carts and range balls at the pro shop. Plaintiff made all decisions with respect to the type, amount and selection of golf-related merchandise and golf equipment available at the pro shop. Throughout his tenure at the pro shop, plaintiff purchased merchandise to sell in the pro shop from approximately 400 manufacturers. All purchases of golf-related merchandise and golf equipment were made under the name "Andy Devers Pro Shop." [3] He received all profit from the sale of golf-related merchandise and equipment.

Plaintiff leased or purchased all golf carts available for rent at Quivira's golf course.[4] When plaintiff leased golf carts for use at Quivira, he leased them under the name "Devers Pro Shop", insured them under the same name, and listed Quivira as an additional insured under the policy. Moreover, plaintiff was personally obligated to make the lease payments. Throughout his tenure as Quivira's golf professional, plaintiff received all fees collected in connection with the driving range, range balls and golf lessons he provided.

Plaintiff was also required to maintain a staff of employees to work in the pro shop. Since 1971, plaintiff was responsible for the payment of all wages, costs and taxes for his employees in the pro shop.[5] The amounts paid in connection with these employees were deducted from amounts paid to plaintiff by Quivira.[6]

## Benefits

Plaintiff has never participated in Quivira's retirement plan and, in fact, has established his own retirement savings account. Plaintiff believes that his savings account is a Keogh account—a retirement plan for self-employed individuals. Moreover, although Quivira provides its employees with health insurance coverage through Principal Health Care of Kansas City, Quivira has not provided plaintiff or his family with health insurance coverage since 1971. Finally, plaintiff set his own schedule with respect to vacation days. Although plaintiff notified John Miller, Quivira's General Manager, of his vacation schedule, Mr. Miller never objected to any vacation schedule set by plaintiff.

## Tax Issues

Since 1971, Quivira has never withheld federal, Social Security, state or local income

---

**3.** Plaintiff made his purchasing decisions through golf-related salesmen or from trade shows. When he went to a trade show in Orlando in 1995, plaintiff paid for all his expenses without reimbursement from Quivira.

**4.** After May 1996, plaintiff was not responsible for leasing additional carts for use in connection with tournaments.

**5.** It appears that assistant golf professionals were employed by defendant, rather than plaintiff.

Accordingly, plaintiff was not responsible for the payment of wages, costs and taxes associated with the assistant golf professionals.

**6.** In 1990, the Department of Labor assessed fines against Quivira for child labor violations with respect to certain employees in the pro shop. Plaintiff agreed to reimburse Quivira for the amount it had paid in fines because he believed that the children were employed by him.

taxes from any amounts paid to plaintiff, including any retainer payments made to plaintiff pursuant to the written contracts between the parties. In addition, Quivira issued IRS Form 1099 to plaintiff for reporting purposes and reported all payments it made to plaintiff since 1971 as payments to a separate entity rather than as payments to an employee. Finally, in every tax return filed by plaintiff since 1991, plaintiff listed his occupation as self-employed and paid self-employment taxes.

## II. Summary Judgment Standard

Summary judgment is appropriate if the moving party demonstrates that there is "no genuine issue as to any material fact" and that it is "entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). In applying this standard, the court views the evidence and all reasonable inferences therefrom in the light most favorable to the nonmoving party. *Adler v. Wal–Mart Stores, Inc.*, 144 F.3d 664, 670 (10th Cir.1998) (citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986)). A fact is "material" if, under the applicable substantive law, it is "essential to the proper disposition of the claim." *Id.* (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986)). An issue of fact is "genuine" if "there is sufficient evidence on each side so that a rational trier of fact could resolve the issue either way." *Id.* (citing *Anderson*, 477 U.S. at 248, 106 S.Ct. 2505).

The moving party bears the initial burden of demonstrating an absence of a genuine issue of material fact and entitlement to judgment as a matter of law. *Id.* at 670–71. In attempting to meet that standard, a movant that does not bear the ultimate burden of persuasion at trial need not negate the other party's claim; rather, the movant need simply point out to the court a lack of evidence for the other party on an essential element of that party's claim. *Id.* at 671 (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 325, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986)).

Once the movant has met this initial burden, the burden shifts to the nonmoving party to "set forth specific facts showing that there is a genuine issue for trial." *Anderson*, 477 U.S. at 256, 106 S.Ct. 2505; *see Adler*,

144 F.3d at 671 n. 1 (concerning shifting burdens on summary judgment). The non-moving party may not simply rest upon its pleadings to satisfy its burden. *Anderson*, 477 U.S. at 256, 106 S.Ct. 2505. Rather, the nonmoving party must "set forth specific facts that would be admissible in evidence in the event of trial from which a rational trier of fact could find for the nonmovant." *Adler*, 144 F.3d at 671. "To accomplish this, the facts must be identified by reference to affidavits, deposition transcripts, or specific exhibits incorporated therein." *Id.*

Finally, the court notes that summary judgment is not a "disfavored procedural shortcut;" rather, it is an important procedure "designed to secure the just, speedy and inexpensive determination of every action." *Celotex*, 477 U.S. at 327, 106 S.Ct. 2548 (quoting Fed.R.Civ.P. 1).

## III. Plaintiff's ADEA Claim

Plaintiff claims that his employment with defendant was terminated on the basis of his age. In support of its motion for summary judgment, defendant maintains that plaintiff is an independent contractor and, thus, is not an "employee" as that term is defined in the ADEA. As set forth in more detail below, the uncontroverted facts demonstrate that plaintiff was an independent contractor. Thus, he is not entitled to the protections of the ADEA. Summary judgment in favor of defendant is appropriate.

Courts attempting to distinguish between employees and independent contractors for purposes of interpreting federal anti-discrimination statutes have developed two primary tests—the economic realities test and the hybrid test. *Oestman v. National Farmers Union Ins. Co.*, 958 F.2d 303, 305 (10th Cir.1992) (citations omitted). The Tenth Circuit has adopted the hybrid approach for determining whether a plaintiff is an "employee" under the ADEA. *See id.* Although this approach considers the economic realities of the working relationship, "the focus of the inquiry is the employer's right to control the 'means and manner' of the worker's performance." *Id.* (quoting *Spirides v. Reinhardt*, 613 F.2d 826, 831 (D.C.Cir.1979)). Other factors to consider

when applying the hybrid test include the following:

(1) the kind of occupation, with reference to whether the work usually is done under the direction of a supervisor or is done by a specialist without supervision; (2) the skill required in the particular occupation; (3) whether the "employer" or the individual in question furnishes the equipment used and the place of work; (4) the length of time during which the individual has worked; (5) the method of payment, whether by time or by the job; (6) the manner in which the work relationship is terminated; i.e., by one or both parties, with or without notice and explanation; (7) whether annual leave is afforded; (8) whether the work is an integral part of the business of the "employer"; (9) whether the worker accumulates retirement benefits; (10) whether the "employer" pays social security taxes; and (11) the intention of the parties.

*Id.* (quoting *Spirides,* 613 F.2d at 832). No single factor is conclusive. *Id.* Rather, the court must consider the totality of the circumstances surrounding the working relationship between the parties. *Id.* (citing *Spirides,* 613 F.2d at 831).

■ The uncontroverted facts here, taken as a whole, demonstrate that plaintiff was an independent contractor and not an employee under the ADEA. As set forth above, the focus of the hybrid test is the employer's right to control the "means and manner" of the worker's performance. *See id.* at 306. Here, plaintiff's daily activities were not supervised and he was free to operate the pro shop, supervise golf activities and conduct tournaments as he chose. It is uncontroverted that defendant never directed plaintiff how to spend his time on a particular day. Moreover, plaintiff made all decisions with respect to the type, amount and selection of merchandise and equipment available in the pro shop. These factors cut against plaintiff's argument that he was an employee of defendant. *See Lambertsen v. Utah Dep't of Corrections,* 79 F.3d 1024, 1028 (10th Cir. 1996) (affirming district court's determination that plaintiff was not an employee where there was no evidence the Department controlled the means or manner in which plaintiff performed her day-to-day work); *Oest-*

*man,* 958 F.2d at 306 (fact that appellant's performance was "subject to virtually no restrictions" supported finding that he was an independent contractor and not an employee under ADEA).

Plaintiff argues that defendant exercised significant control over the means and manner of plaintiff's performance because the written contract outlined plaintiff's specific duties and required plaintiff to devote his "full time and attention" to the performance of those duties. While these facts indicate that defendant designated the specific duties plaintiff was to perform (and required those duties to be performed satisfactorily), such facts do not indicate that defendant controlled the means or manner in which plaintiff performed those duties. Plaintiff also suggests that defendant controlled the means and manner of his performance because it determined the prices charged for golf lessons, cart rentals and green fees. Again, the court is unpersuaded. This fact has no bearing on whether defendant controlled the manner in which plaintiff conducted his daily activities. *See Aguirre v. McCaw RCC Communications, Inc.,* 953 F.Supp. 1222, 1226–28 (D.Kan.1997) (concluding that telecommunications company did not control the means and manner of dealer's performance despite fact that defendant unilaterally set airtime plans, cost per minute and monthly charges for service). In further support of its argument, plaintiff highlights that defendant determined the hours during which the golf course, pro shop and driving range would be open for use. Significantly, however, these facts do not demonstrate that defendant controlled the manner in which plaintiff spent his time (or, for that matter, even required plaintiff to be present) during those hours. Finally, plaintiff suggests that defendant controlled plaintiff's performance because it required plaintiff to submit weekly accounting reports to defendant. This fact, however, is insufficient to permit an inference that plaintiff was an employee.

Other aspects of the working relationship between the parties also lead to the conclusion that plaintiff was an independent contractor rather than an employee. Although defendant necessarily provided the place of work (*i.e.,* the golf course and related facili-

ties), plaintiff was responsible for furnishing the equipment associated with his work. Specifically, plaintiff leased or purchased all golf carts and purchased all merchandise and equipment available in the pro shop.[7] Plaintiff received the profits earned from the sale of all merchandise and equipment in the pro shop as well as fees collected in connection with the driving range, range balls and golf lessons he provided. In addition, plaintiff was responsible for the payment of wages and taxes with respect to his employees in the pro shop. He was also free to take a vacation whenever he deemed appropriate.

Finally, the parties' conduct demonstrates that plaintiff was an independent contractor. Defendant did not withhold taxes from plaintiff's pay and did not pay social security taxes for him. *See Oestman,* 958 F.2d at 306 (fact that appellees did not withhold taxes from appellant's and did not pay social security taxes for him supported finding that appellant was an independent contractor). Since 1971, defendant reported payments made to plaintiff as payments to a separate entity. Even though defendant provided health insurance coverage to its employees, it did not provide such coverage to plaintiff. More evidence of the parties' intent can be found in plaintiff's own conduct. Since 1971, plaintiff filed his taxes as a self-employed individual. In addition, plaintiff established and maintained a Keogh plan which is only available to self-employed individuals. *See Oestman,* 958 F.2d at 306 (fact that appellant files his taxes as a self-employed individual and maintained Keogh plan supported finding that appellant was an independent contractor).

Significantly, plaintiff made all purchases for the pro shop under the name "Andy Devers Pro Shop." He leased and insured all golf carts under the same name. Finally, plaintiff paid all fees and expenses in connection with his recertification and even reimbursed defendant for fines assessed by the Department of Labor because of his belief that the fines were associated with "his" employees in the pro shop. Perhaps most telling, however, is the fact that the parties expressly agreed in 1971 that plaintiff would become an independent contractor.[8]

In sum, there may be some aspects of the working relationship between the parties that, standing alone, seem to indicate an employer-employee relationship.[9] Based on the totality of the circumstances surrounding the working relationship, however, the court concludes that the relationship is more accurately characterized as employer-independent contractor. Accordingly, the court grants defendant's motion for summary judgment on plaintiff's ADEA claim.

## IV. Plaintiff's ERISA Claim

Plaintiff asserts a claim for benefits under defendant's retirement plan and health plan. Defendant moves for summary judgment on plaintiff's ERISA claim on the grounds that plaintiff, as an independent contractor, was not eligible for benefits under either plan. Plaintiff moves for summary judgment on his ERISA claim on the grounds that he was an employee for purposes of defendant's retirement and health plans and, in the alternative, that he was a "self-employed individual" as defined in defendant's retirement plan.[10]

7. Defendant, however, was obligated to provide tees, pencils and scorecards.

8. Plaintiff attempts to argue that the parties intended an employment relationship because the written contract is designated as an "Employment Agreement" and does not use the phrase "independent contractor." In his deposition, however, plaintiff unequivocally testified that he agreed to become an independent contractor in 1971.

9. Plaintiff maintains, for example, that the length of plaintiff's relationship with defendant and the fact that plaintiff's work was an "integral part" of defendant's business indicate that an employer-employee relationship existed between the parties. While these factors might suggest such a relationship under certain circumstances, the

totality of the circumstances here suggests otherwise. *See Oestman,* 958 F.2d at 304, 305–06 (affirming district court's determination that plaintiff was an independent contractor in light of totality of circumstances despite the fact that plaintiff's relationship with defendant began in 1963); *Aguirre,* 953 F.Supp. at 1228 (concluding that plaintiff was an independent contractor in light of totality of circumstances despite the fact that dealers played an integral role in defendant's business).

10. In his motion for partial summary judgment, plaintiff appears to state a separate claim for defendant's failure to respond timely to plaintiff's request for benefits. Although plaintiff purports to assert this claim pursuant to § 1133 of ERISA, the Tenth Circuit has recognized that this provision provides for recovery only against the

Because the court concludes that defendant's denial of retirement benefits was not arbitrary and capricious and that defendant's denial of health benefits was proper under a *de novo* standard of review, the court grants defendant's motion for summary judgment and denies plaintiff's motion for partial summary judgment. Plaintiff's claim for benefits is dismissed.

### A. Standard of Review

■ Plaintiff seeks review of defendant's denial of benefits under the retirement and health plans. "[A] denial of benefits challenged under § 1132(a)(1)(B) is to be reviewed under a *de novo* standard unless the benefit plan gives the administrator or fiduciary discretionary authority to determine eligibility for benefits or to construe the terms of the plan," in which event an arbitrary and capricious standard is appropriate. *Firestone Tire & Rubber Co. v. Bruch,* 489 U.S. 101, 115, 109 S.Ct. 948, 103 L.Ed.2d 80 (1989).

### 1. The Retirement Plan

■ Defendant's retirement plan explicitly granted defendant discretionary authori-

ty "[t]o determine the rights of eligibility of an Employee to participate in the Plan" and "[t]o construe and enforce the terms of the Plan . . . including interpretation of the Plan documents." *See* Plan § 9.04(b) & (d). The arbitrary and capricious standard is therefore appropriate in analyzing defendant's denial of plaintiff's request for retirement benefits.[11] Accordingly, the court must determine whether defendant's denial of benefits to plaintiff was arbitrary and capricious. Indicia of arbitrary and capricious actions include a lack of substantial evidence, a mistake of law, and bad faith. *Sandoval v. Aetna Life & Casualty Ins. Co.,* 967 F.2d 377, 380 n. 4 (10th Cir.1992). "The touchstone of [the court's] inquiry is whether defendant's interpretation of its plan is reasonable." *Semtner v. Group Health Service of Oklahoma, Inc.,* 129 F.3d 1390, 1393 (10th Cir.1997); *see McGraw v. Prudential Ins. Co. of Am.,* 137 F.3d 1253, 1259 (10th Cir. 1998) ("A decision to deny benefits is arbitrary and capricious if it is not a reasonable interpretation of the plan's terms."); *Chambers v. Family Health Plan Corp.,* 100 F.3d 818, 827 (10th Cir.1996) (determination was

---

"plan" and, thus, cannot be used to recover against a plan administrator. *See Walter v. International Ass'n of Machinists Pension Fund,* 949 F.2d 310, 315 (10th Cir.1991) (citing *Groves v. Modified Retirement Plan,* 803 F.2d 109, 116 (3d Cir.1986)). Pursuant to § 1132(c)(1), however, a plan administrator who fails or refuses to comply with a request "within 30 days after such request may in the court's discretion be personally liable to such . . . beneficiary in the amount of up to $100 a day from the date of such failure or refusal." 29 U.S.C. § 1132(c)(1). Even assuming plaintiff's purported claim for relief arises under § 1132(c)(1), summary judgment is appropriate in favor of defendant.

As an initial matter, plaintiff failed to assert in the pretrial order any claim for civil penalties stemming from defendant's untimely response. Thus, any cause of action plaintiff may have had arising out of defendant's untimely response to his claim for benefits is deemed waived and the court need not address it. *See Tyler v. City of Manhattan,* 118 F.3d 1400, 1403 (10th Cir.1997); *Zinn v. McKune,* 949 F.Supp. 1530, 1534 (D.Kan. 1996), *aff'd,* 143 F.3d 1353 (10th Cir.1998). Even if plaintiff had properly preserved this claim, however, the court, in its discretion, would not assess civil penalties against defendant under the circumstances here. Plaintiff filed his lawsuit—including an ERISA claim—the day after he submitted to defendant his claim for bene-

fits. As set forth in more detail in note 12 of this opinion, defendant did not respond to plaintiff's request because it believed that the intervening lawsuit was the means by which plaintiff's benefits claim would be resolved. In fact, defendant provided a response to plaintiff's claim for benefits during the discovery process. The court concludes that defendant's delay in responding to plaintiff's claim for benefits was reasonable under the circumstances and does not warrant the imposition of civil penalties.

11. Plaintiff vaguely suggests, without argument or authority, that the court should review defendant's denial of retirement benefits under a *de novo* standard because the retirement plan did not grant the administrator discretionary authority to determine the specific issue here—whether a claimant was an employee or an independent contractor. The court rejects plaintiff's contention. The plan here expressly gives the administrator discretionary authority to determine whether an individual is eligible for benefits. Clearly, in determining whether an individual is eligible for benefits, the administrator must decide whether an individual is an "employee" or "self-employed individual" within the meaning of the plan. Thus, the authority to determine whether an individual is an employee or an independent contractor, if not expressly stated, is at least implied by the plan's terms.

"reasonable" and therefore was not arbitrary and capricious).

■ The court agrees with plaintiff, however, that the court's deference to defendant's decision is not unlimited in light of defendant's conflict of interest in this matter. If an ERISA plan gives discretion to a fiduciary acting under a conflict of interest, that conflict may be a factor for the court's consideration. *Firestone*, 489 U.S. at 115, 109 S.Ct. 948. The Tenth Circuit has held that "the degree of deference to accord such a decision will be decreased on a sliding scale in proportion to the extent of conflict present, recognizing the arbitrary and capricious standard is inherently flexible." *McGraw*, 137 F.3d at 1258; *accord Chambers*, 100 F.3d at 825 (level of deference to the decision is decreased in proportion to the seriousness of the conflict).

In the present case, a conflict of interest is present because defendant's determination of whether it would pay plaintiff benefits affected defendant financially. *See McGraw*, 137 F.3d at 1258–59 ("[B]ecause every exercise of discretion impacts Prudential financially, filling or depleting its coffers, we afford its decisions less deference depending on the degree of conflict manifest."). Thus, the court affords defendant a lesser amount of deference.

### 2. The Health Plan

Neither plaintiff nor defendant directs the court to any provisions in the health plan regarding whether the plan administrator has discretionary authority to determine eligibility for benefits or to construe the terms of the plan. Moreover, the court has not uncovered any such provisions in its review of the health plan documents before it. Thus, the court will review defendant's denial of health benefits to plaintiff under a *de novo* standard.

### B. Scope of Review

■ The parties agree that the court's review of defendant's decision with respect to plaintiff's request for retirement benefits is limited to the arguments and evidence before defendant when it made its claims decision. *See Buchanan v. Reliance Standard Life Ins. Co.*, 5 F.Supp.2d 1172, 1180 (D.Kan.1998) (citing *Sandoval*, 967 F.2d at 380 ("In determining whether the plan administrator's decision was arbitrary and capricious, the district court generally may consider only the arguments and evidence before the administrator at the time it made that decision.")). The record before defendant at the time of its decision includes Exhibit 1 and its attachments, Exhibits A through H. As this court has previously stated, however, it may consider "new evidence on the narrow issue of the *manner* in which defendant made its decision, so that the court may determine whether defendant acted arbitrarily in making that decision." *See Buchanan*, 5 F.Supp.2d at 1181 (considering deposition testimony only to the extent it bears on the procedure by which defendant reached its decision) (citations omitted).

### C. Analysis

■ In denying plaintiff's claim for benefits, defendant determined that plaintiff was not eligible to participate in its employee benefit plans because he was an independent contractor and not an "employee" or "self-employed individual" within the meaning of the plans. Plaintiff argues that defendant's denial of his claim for benefits was arbitrary and capricious because, according to plaintiff, the information before defendant at the time of its decision clearly demonstrated that plaintiff was an "employee" or "self-employed individual." The court has reviewed the record, however, and it concludes that defendant's determination that plaintiff was not an "employee" or a "self-employed individual" within the meaning of its retirement plan was reasonable. Even given the conflict of interest here and the diminished amount of deference therefore afforded by the court, defendant's decision was not arbitrary and capricious. Moreover, defendant's determination that plaintiff was not an "employee" for purposes of its health plan was proper. Accordingly, defendant is entitled to summary judgment on plaintiff's ERISA claim.

### 1. Plaintiff's Request for Benefits and Defendant's Denial of his Request

On November 17, 1997, plaintiff submitted to John Miller, defendant's General Manager,

a claim for benefits under defendant's retirement plan and health insurance plan. In support of his claim, plaintiff also submitted the plan documents; the written contract between plaintiff and defendant; an affidavit from plaintiff in which he sets forth the reasons for his belief that he is eligible to participate in defendant's benefit plans; and the position description for plaintiff's replacement. Mr. Miller testified that he made the decision, on behalf of defendant, to deny plaintiff's claim for benefits. In making his determination, Mr. Miller did not review any documents other than those received from plaintiff with his request.

According to Mr. Miller, he determined that plaintiff was not eligible to participate in defendant's employee benefit plans because of plaintiff's status as an independent contractor. Although Mr. Miller testified that he made the decision to deny plaintiff benefits at the time he received the information from plaintiff, he verified his decision with John Finn, a plan representative with DeMars Pension. Specifically, Mr. Miller discussed with Mr. Finn the definition of the term "self-employed" within the meaning of the retirement plan. Mr. Finn advised Mr. Miller that he was correct in denying plaintiff's claim for benefits under the retirement plan because the term "self-employed" did not apply to an individual who had an independent contractor relationship with defendant. A written response was thereafter provided to plaintiff in connection with defendant's responses to plaintiff's first interrogatories.[12] As Mr. Miller explained in defendant's responses to plaintiff's interrogatories:

Quivira, for and on behalf of its Administrative Committee, denied Devers' request for participation in its [retirement] plan on the following basis:

The Defined Contribution Prototype Plan and Trust Agreement (the "Plan") was adopted by Quivira on January 1, 1995. The Plan defines an Employee as any employee "(including a Self–Employed Individual)" of Quivira. Paragraph 1.07.

The term "Self–Employed Individual" is defined. Such a person is any individual "who has Earned Income (or who would have had Earned Income but for the fact that the trade or business did not have net earnings) for the taxable year from the trade or business for which the Plan is established." Plan; Paragraph 1.08. The term "Earned Income" is also defined. It means "net earnings from self-employment in the trade or business with respect to which the Employer has established the plan, provided personal services of the individual are a material income producing factor." Plan; Paragraph 1.13.

Mr. Devers was self-employed for his business, that of Mr. Devers. Quivira did not establish the Plan with respect to *his* business. Thus, Mr. Devers was not a "Self–Employed Individual" as the term is used in the retirement savings program, and he did not have Earned Income, because his trade or business was not the one for which the Plan was established.

Defendant's Response to Plaintiff's First Interrogatory No. 12 (April 17, 1998). Mr. Miller also testified that defendant extended health care benefits only to employees, former employees and their families.[13]

### 2. Defendant's Determination that Plaintiff Was Not an "Employee"

As an initial matter, the court concludes that defendant's implicit determination that plaintiff was not an "employee" within the meaning of its retirement plan and health plan was considered and eminently reasonable. Although the court applies the arbitrary and capricious standard to defendant's decision with respect to the retirement plan, the court reaches the same result under the *de novo* standard applicable to defendant's decision with respect to the health plan. The United States Supreme Court has adopted the common law agency test for determining

---

12. Plaintiff filed his lawsuit, including his claim for benefits under ERISA, on November 18, 1997—the day after he submitted his claim for benefits to defendant. According to Mr. Miller, the filing of plaintiff's lawsuit led him to believe that a separate written response to plaintiff's request for benefits was unnecessary and, rather, that plaintiff's request would be handled in connection with the suit. Thus, defendant did not provide plaintiff a written response to his request for benefits until it served its answers to plaintiff's first interrogatories.

13. According to the terms of defendant's health plan, only "active employees" or "employee[s] ... actively at work" are eligible to participate.

whether an individual is an employee for purposes of ERISA. *Nationwide Mut. Ins. Co. v. Darden,* 503 U.S. 318, 323, 112 S.Ct. 1344, 117 L.Ed.2d 581 (1992). This test considers the hiring party's right to control the manner and means by which the product is accomplished. *Herr v. Heiman,* 75 F.3d 1509, 1512–13 (10th Cir.1996). The factors relevant to this inquiry are: (1) the skill required; (2) the source of the instrumentalities and tools; (3) the location of the work; (4) the duration of the relationship between the parties; (5) whether the hiring party has the right to assign additional projects to the hired party; (6) the extent of the hired party's discretion over when and how long to work; (7) the method of payment; (8) the hired party's role in hiring and paying assistants; (9) whether the work is part of the regular business of the hiring party; (10) whether the hiring party is in business; (11) the provision of employee benefits; and (12) the tax treatment of the hired party. *Id.* at 1513 (citing *Darden,* 503 U.S. at 323–24, 112 S.Ct. 1344). A court may also consider the intent of the parties and their beliefs as to whether they have created the relation of employer and employee. *Roth v. American Hosp. Supply Corp.,* 965 F.2d 862, 866 (10th

Cir.1992) (citations omitted). Under this test no single factor is decisive; the overall relationship between the parties must be assessed and weighed. *Herr,* 75 F.3d at 1513 (citing *NLRB v. United Ins. Co. of Am.,* 390 U.S. 254, 258, 88 S.Ct. 988, 19 L.Ed.2d 1083 (1968)).

As set forth above in connection with plaintiff's ADEA claim, the court has concluded that plaintiff was an independent contractor under the hybrid test. The Tenth Circuit has explained that "the common-law agency approach discussed in *Darden* is in practice largely indistinguishable from the hybrid approach" utilized in Title VII and ADEA cases. *See Lambertsen v. Utah Dep't of Corrections,* 79 F.3d 1024, 1028 (10th Cir. 1996) (citations omitted); *McIntire v. Bowen–Leavitt Ins. Agency, Inc.,* 103 F.3d 144, 1996 WL 700034, at *2 n. 6 (10th Cir.1996) (noting that the court would reach the same result under either test). Thus, the court's conclusion that plaintiff was an independent contractor under the hybrid test compels the conclusion that plaintiff was an independent contractor under the common-law test for ERISA purposes. Defendant's determination in this regard was proper.[14]

14. Plaintiff cites several sources from the Internal Revenue Service in an effort to convince the court that he is an employee rather than an independent contractor. These sources essentially state that golf professionals—under the facts presented to the IRS—are employees for tax purposes. *See* Rev. Rul. 68–626, 1968–2 C.B. 466; Priv. Ltr. Rul. 91–29–017 (Apr. 19, 1991); Tech. Adv. Mem. 97–17–001 (Apr. 25, 1991). As an initial matter, these materials are not binding precedent on this court. *See ABC Rentals of San Antonio, Inc. v. C.I.R.,* 142 F.3d 1200, 1205 (10th Cir.1998). In any event, these materials are not relevant to the court's analysis. In Revenue Ruling 68–626, for example, the IRS emphasized that the "club has the right to direct and control the manner in which [the golf professional] manages the golf shop." Those facts are not present here. In Private Letter Ruling 91–29–017, the IRS determined that an *assistant* golf professional was an employee where the head golf professional had the right to instruct and supervise him and the Parks and Recreation Department retained the right to direct and change the methods he used in the performance of his duties. Again, those facts are not present here. Defendant did not control the manner and means in which plaintiff performed his daily functions. Under such facts, the IRS has determined that a golf professional is an independent contractor. Rev. Rul. 68–625, 1968–2 C.B. 465 (golf professional

not employee for tax purposes where he carried out activities without orders or instructions from club members or officials).

Similarly, plaintiff directs the court to a Seventh Circuit opinion and an opinion from the Tennessee Court of Appeals in support of his position. *See Ridge Country Club v. United States,* 135 F.2d 718 (7th Cir.1943); *Edwin B. Raskin Co. v. Johnson,* Appeal No. 01–A–01–9708–CH–00392, 1998 WL 242605 (Tenn.Ct.App. May 15, 1998). Ironically, the Seventh Circuit's opinion in *Ridge Country Club* supports the defendant's position here. In *Ridge Country Club,* the issue was whether the income a golf professional received from the operation of his pro shop and from lessons should be treated as taxable income for purposes of the club's social security tax payments. *Id.* at 719. The court held that the golf professional was an independent contractor with respect to his pro shop operations and, thus, excluded profits earned in connection with the pro shop from plaintiff's social security tax. *Id.* at 720. In reaching its conclusion, the Seventh Circuit emphasized that the club received no profit from the shop or instruction fees. *Id.* The Tennessee Court of Appeals' decision, on the other hand, is easily distinguished from the facts here. In *Raskin,* the sole issue before the court was whether the private manager of a city-owned golf course was

### 3. Defendant's Determination that Plaintiff Was Not a "Self–Employed Individual"

The court next turns to defendant's determination that plaintiff was not a "self-employed individual" within the meaning of its retirement plan. According to Mr. Miller, this determination was made because plaintiff did not meet the requirements of a "self-employed individual" under the definitions in the Plan. The Plan defines a "self-employed individual" as any person "who has Earned Income . . . from the trade or business for which the Plan is established." Plan, ¶ 1.08. The Plan defines "Earned Income" as "net earnings from self-employment in the trade or business with respect to which the Employer has established the Plan." Plan, ¶ 1.13. Mr. Miller determined that plaintiff was not eligible for benefits under this definition because he did not "earn income" from "self-employment in the trade or business with respect to which the Employer has established the Plan." In other words, plaintiff earned income from self-employment in his own business, but not the business for which defendant established the Plan. Defendant established the Plan for its business—Quivira, Inc.

As set forth above, defendant had discretion to interpret the terms of its policy and it was not bound to construe the definition of "self-employed individual" as encompassing independent contractors. This court is not charged with interpreting the definition; rather the court considers whether defendant's interpretation was reasonable. *See Buchanan v. Reliance Standard Life Ins. Co.,* 5 F.Supp.2d 1172, 1182 (D.Kan.1998). The court cannot say that defendant acted unreasonably when it interpreted the defini-

tion of "self-employed individual" as it did. Moreover, a review of paragraph 1.08 in its entirety suggests that the phrase "self-employed individual" is intended to cover sole proprietors or partners when the employer is a proprietorship or partnership.[15] For these reasons, Mr. Miller's interpretation was not arbitrary and capricious.

In summary, the court concludes that defendant acted reasonably in denying plaintiff's claim for retirement benefits. Defendant's denial of the claim was not arbitrary and capricious, even under a lesser degree of deference. Moreover, the court concludes that defendant's decision to deny plaintiff's health benefits was proper under a *de novo* standard of review. Accordingly, summary judgment in favor of defendant is appropriate.

**IT IS THEREFORE ORDERED BY THE COURT THAT** defendant's motion for summary judgment (doc. # 39) is **granted** and plaintiff's motion for partial summary judgment (doc. # 41) is **denied.** Plaintiff's complaint is dismissed in its entirety.

**IT IS SO ORDERED.**

---

entitled to the city's exemption from sales and use taxes. *Id.* at *1. In resolving that issue, the court concluded that the private manager was the City's agent rather than an independent contractor because the City retained control over the manager's operation of the course. *Id.* at *3. Unlike the facts here, the golf professional in *Raskin* paid all net operating income from the operation of the course to the City. *Id.*

15. Paragraph 1.08 reads as follows:
"Self–Employed Individual/Owner–Employee." "Self–Employed Individual" means an individual who has Earned Income (or who would have had Earned Income but for the

fact that the trade or business did not have net earnings) for the taxable year from the trade or business for which the Plan is established. "Owner–Employee" means a Self–Employed Individual who is the sole proprietor in the case of a sole proprietorship. If the Employer is a partnership, "Owner–Employee" means a Self–Employed Individual who is a partner and owns more than 10% of either the capital or profits interest of the partnership.

Defendant's Plan is a form plan issued by De-Mars Pension Consulting Services. Thus, the mere fact that the phrase "self-employed individual" appears in defendant's Plan does not necessarily mean that it applies to anyone.